UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 11-11912-RGS

MARK S. TRENT

v.

ADT SECURITY SERVICES, INC.

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

August 22, 2013

STEARNS, D.J.

Plaintiff Mark S. Trent brought this action against his former employer, defendant ADT Security Services, Inc. (ADT), alleging discrimination and retaliation in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.* (ADEA), Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000(e) *et seq.*, and the analog Massachusetts discrimination statute, Mass. Gen. Laws ch. 151B. The Second Amended Complaint also asserts state-law claims related to ADT's alleged failure to pay Trent earned commissions.[1] Discovery having been

---

[1] The claims are: failure to pay wages and/or commissions in violation of the Massachusetts Wage Act, Mass. Gen. Laws ch. 149, § 148 (Count V); breach of contract (Count VI); and promissory estoppel (Count VII).

1

completed, ADT moves for summary judgment on all counts.   A hearing on the motion was held on August 8, 2013.

BACKGROUND

ADT is a nationwide corporation providing security equipment and monitoring services to home owners and small businesses.   Trent began working for ADT in December of 2000, as a small business sales representative.   He was subsequently offered a role as a residential sales representative in May of 2001, a position he maintained until his discharge in 2009.   Throughout his employment, Trent was classified as an at-will employee and was paid on a commission basis.

**Disciplinary Action**

Although Trent excelled as a salesman,[2]  his behavior in the workplace was often confrontational and fractious.   Between 2005 and 2009, Trent was issued multiple warnings for abusive conduct toward his coworkers in violation of ADT company policies.   The warnings cited numerous instances in which Trent sent coworkers hostile emails, raised his voice, and

---

[2]  Trent generated considerable revenue for ADT and ranked among the top sales representatives in his local office and the New England region.

behaved in a condescending manner.[3]   ADT warned Trent that his conduct would not be tolerated.   On March 23, 2009, ADT managers Marc Bouchard and Alex Haigh issued Trent a "final written warning" after he left coworker Marc Lippa a threatening voicemail.   Trent objected to the warning and, in the days following, complained to Haigh, who relayed the complaint to Bouchard, that he was being "targeted," and that Lippa had engaged in far more egregious behavior without being reprimanded.   ADT investigated Trent's accusations against Lippa and, on June 9, 2009, suspended Lippa and issued him a final warning after he admitted to leaving Trent a profane voicemail and sending inappropriate materials to a coworker's cell phone.

### Termination

Between April and May of 2009, ADT became aware of three suspect sales transactions in which Trent was involved.   On April 15, 2009, Bouchard and Haigh received an email from Lippa alleging that Trent had falsely booked a sale to a homeowner customer.   Haigh investigated and determined that Trent had reported the alleged sale, but there was no record of a contract.   Haigh then spoke to the customer, who confirmed that she

---

[3] Trent does not deny the specifics of his behavior, but disputes ADT's characterization of his conduct as unethical.

had never signed a contract or agreed to purchase security services from Trent.

On April 27, 2009, Ellen Phillips, an ADT residential installation coordinator, complained about a similar questionable sale. Earlier that day, Phillips had attempted to set up an installation appointment with one of Trent's customers. Although Trent had reported the sale in ADT's computerized sales reporting system several days before, the customer explained to Phillips that he had not yet signed the contract, and that Trent was not scheduled to visit his home until the following day. After further investigation, ADT determined that Trent had reported the sale on April 24th, the last day of the fiscal month, when sales commissions were generally more lucrative under ADT's compensation plan.[4] Had he reported the sale on April 28th, the actual date of the scheduled sales visit, Trent would have been paid $130 less in commission.

A few days later, ADT sales manager Greg Short discovered duplicate accounts in the sales system for then professional football player Chris Baker. An investigation determined that on May 9, 2009, customer service had answered an inquiry from Baker regarding the purchase of a security

---

[4] Under ADT's then compensation plan, a sales representative received a commission keyed to the total number of units he sold over the fiscal month.

system and had assigned the prospective sale to Trent.   Customer service had scheduled Baker's appointment for May 14 at 4:00 p.m. and forwarded the information, along with Baker's address and phone number, in an email to Trent.   Less than an hour after the scheduled appointment with Baker, Trent set up a new account for Baker, which he designated as a self-generated lead.[5]   The account as listed by Trent had a slightly different address and phone number for Baker.

On May 20, 2009, Bouchard and Haigh met with Trent to discuss the three transactions and, after finding Trent's explanations unsatisfactory, suspended him.[6]   Trent protests that the suspension meeting lasted only ten minutes, and that he was not given an adequate opportunity to explain himself.   Baouchard and Haigh, however, concluded that Trent had falsely reported the sales for his personal monetary benefit, a violation of the company's ethical code.   Bouchard and Haigh recommended termination

---

[5] A self-generated lead, or "SGL," is a lead created by the sales representative.   Because they are paid at a higher commission rate, SGLs are generally more profitable than leads provided through customer service.

[6] Bouchard attempted to contact Baker but, after being unable to reach him, interviewed ADT's sales system manager, who confirmed that Trent had received the Baker lead from the company and later reported it as an SGL.

and, with the approval of human resources director James Cournane, discharged Trent on May 26, 2009.   Trent was then fifty-six years old.

On August 13, 2009, Trent filed charges with the Massachusetts Commission Against Discrimination (MCAD) and the federal Equal Employment Opportunity Commission (EEOC).[7]   He subsequently brought this lawsuit on October 27, 2011, claiming age, gender, and national origin discrimination, hostile work environment, and retaliation in violation of the ADEA, Title VII and Mass. Gen. Laws ch. 151B.   Trent also raises breach of contract, promissory estoppel, and Massachusetts Wage Act claims based on ADT's failure to pay him earned commissions.

## DISCUSSION

Summary judgment is appropriate when the evidence, viewed in the light most favorable to the non-moving party, "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case."   *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-250 (1986).   Once the moving party

---

[7] Neither party has provided the court with the MCAD or EEOC rulings.

has established that no genuine issue of material fact exists, the burden "shifts to the nonmoving party to establish the existence of an issue of fact that could affect the outcome of the litigation." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990).   Where, as here, "the nonmovant bears the ultimate burden of proof, he must present definite, competent evidence to rebut the motion [for summary judgment]." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991).   "Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

**Age Discrimination**

Under federal and state law it is unlawful for an employer to discriminate against an employee because of his or her age.   29 U.S.C. § 623(a)(1); M.G.L. ch. 151B, § 4.   Where there is no direct evidence of age discrimination, such claims are evaluated under the familiar three-step framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-805 (1973).   *See Bonefont-Igaravidez v. Int'l Shipping Corp.*, 659

F.3d 120, 123 (1st Cir. 2011);   *Sullivan v. Liberty Mut. Ins. Co.*, 444 Mass. 34, 39-40 (2005).

The first stage of the *McDonnell Douglas* framework requires a plaintiff to establish a prima facie case of employment discrimination. *Velez v. Thermo King de Puerto Rico, Inc.*, 585 F.3d 441, 447 (1st Cir. 2009).   With respect to age-based termination, the plaintiff must produce evidence showing that: (1) he was at least forty years of age; (2) he was qualified for the position he had held; (3) he was terminated; and (4) his employer subsequently demonstrated a continuing need for the services he had been providing. [8]   *Bonefont-Igaravidez*, 659 F.3d at 124.   If the plaintiff succeeds in establishing a prima facie case, a presumption of age-based discrimination arises and the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the termination.   *Id.* The employer's burden is one of production, not persuasion.   *Davila v. Corporacion De Puerto Rico Para La Difusion Publica*, 498 F.3d 9, 16 (1st

[8]   The First Circuit does not require a plaintiff under the ADEA to establish, as an element of his prima facie case, that he was replaced by an individual younger than himself, or by someone outside the protected class.   *See Hebert v. Mohawk Rubber Co.*, 872 F.2d 1104, 1110 n.10 (1st Cir. 1989); *Sanchez v. Puerto Rico Oil Co.,* 37 F.3d 712, 719 n.7 (1st Cir. 1994); s*ee also O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996) (that an ADEA plaintiff was replaced by someone outside the protected class is not an element of the prima facie case - the "ADEA prohibits discrimination on the basis of age and not class membership.")

Cir. 2007).   Accordingly, "the employer need do no more than articulate a reason which, on its face, would justify a conclusion that the plaintiff was let go for a nondiscriminatory motive." *Id.*   If the employer does so, the presumption of discrimination disappears, and the burden shifts back to the employee to show by a preponderance of the evidence that the employer's proffered explanation "is pretextual and that the true reason for the adverse action is discriminatory."   *Bonefont-Igaravidez*, 659 F.3d at 124, quoting *Lockridge v. Univ. of Maine Sys.*, 597 F.3d 464, 470 (1st Cir. 2010) (internal quotation marks omitted).

ADT first challenges Trent's assertion that he was qualified to remain in his job.[9]   In support of this argument, ADT relies on the evidence it has assembled of the three fraudulently booked sales.   The First Circuit has explained, however, that a plaintiff "is not required to disprove the defendant's proffered nondiscriminatory reason for taking an adverse employment action" at the prima facie stage.[10]   *Acevedo-Parrilla v.*

---

[9]  The first, third, and fourth elements are not in dispute.

[10]  The ordering is not, however, rigid.
> The shifting of the burden of production in an ADEA case does not always correspond neatly to the orderly presentation of evidence at trial.   Thus, it is not unusual for a plaintiff to introduce in her case-in-chief evidence that, within the *McDonnell Douglas* framework, is best understood as

*Novartis Ex-Lax, Inc.*, 696 F.3d 128, 139 (1st Cir. 2012).   Doing so would "bypass the burden-shifting analysis and deprive the plaintiff of the opportunity to show that the nondiscriminatory reason was in actuality a pretext designed to mask discrimination."   *Velez*, 585 F.3d at 448, quoting *Wexler v. White's Wine Furniture, Inc.*, 317 F.3d 564, 574 (6th Cir. 2003); *see also Melendez v. Autogermana, Inc.*, 622 F.3d 46, 51 (1st Cir. 2010) (same).   Trent argues, without contradiction, that he was a top-ranked sales representative during the nine years he was employed by ADT, which is sufficient to clear the plaintiff's low prima facie hurdle.   *See Mesnick*, 950 F.2d at 823.

The burden as a result shifts to ADT to articulate a legitimate, nondiscriminatory reason for firing Trent.   ADT's articulated reason for terminating Trent is not surprisingly identical to its attack on Trent's prima facie case, that is, that theft from the company is always a fireable offense.

---

responsive to evidence introduced by defendants to counter the *prima facie* case.   The fact that a plaintiff introduces such evidence in her case-in-chief, rather than waiting for the defendants to present their case, does not mean that anticipation and rebuttal of the defendants' case constitute an element of the *prima facie* case.   To hold otherwise would belie the assertion of the Supreme Court that the burden of establishing a *prima facie* case is "not onerous."   *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). *Keisling v. SER-Jobs for Progress, Inc.*, 19 F.3d 755, 761 (1st Cir. 1994).

And so it would seem to the court.

In a summary judgment proceeding, "once the employer articulates a legitimate, non-discriminatory basis for the adverse employment decision [as is the case here], the plaintiff 'before becoming entitled to bring the case before the trier of fact, must show evidence sufficient for the factfinder reasonably to conclude that the employer's decision to discharge him or her was wrongfully based on age.'" *Pages-Cahue v. Iberia Lineas Areas de Espana*, 82 F.3d 533, 536 (1st Cir. 1996), quoting *LeBlanc*, 6 F.3d at 843. "[A] reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, and that discrimination was the real reason." *Hidalgo v. Overseas Condado Ins. Agencies, Inc.*, 120 F.3d 328, 335 (1st Cir. 1997), quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515 (1993); *accord Ruiz v. Posadas de San Juan Assocs.*, 124 F.3d 243, 248 (1st Cir. 1997) (evidence of discrimination must be of such strength and quality as to permit a finding that an adverse action was "obviously or manifestly unsupported.")

Pretext can be established by showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons" for termination that a "reasonable

factfinder could rationally find them unworthy of credence."
*Gomez-Gonzalez v. Rural Opportunities, Inc.*, 626 F.3d 654, 662-663 (1st
Cir. 2010) (internal quotation marks and citation omitted).   In support of
his argument that the stated reason for his discharge (theft) was pretextual,
Trent points to a number of alleged "weaknesses" in the thoroughness of
ADT's pre-termination investigation.   He claims that ADT did not give him
a sufficient opportunity to explain his behavior, and did not adequately
investigate the circumstances behind the three questionable sales
transactions.   Trent's attempt at showing pretext is almost completely
devoted to rendering "his side of the story" -- convoluted explanations of
how the sales came to be falsely booked. [11]   These post-hoc rationalizations,
however, miss the legal mark.

---

[11] Trent makes several additional arguments grounded in irrelevant facts.
He claims he was subjected to discriminatory comments, including one that
he was "too old" to generate enough sales leads.   The record reflects,
however, that the comment or comments were made by a
non-decisionmaker years before Trent's termination.   *See Melendez*, 622
F.3d at 54 ("[S]tray workplace remarks, as well as statements made either by
non-decisionmakers or by decisionmakers not involved in the decisional
process . . . are insufficient, standing alone, to establish either pretext or the
requisite discriminatory animus."), quoting *Gonzalez v. El Dia, Inc.*, 304
F.3d 63, 69 (1st Cir. 2002) (internal quotation marks omitted).   Likewise, he
claims coworkers Lippa and Ionelli regularly behaved inappropriately
without reprimand.   These allegations, however, are not probative of age
discrimination, as both employees were well within Trent's protected class at
the time (ages fifty-six and fifty-two, respectively).   Moreover, Lippa and

12

A court's focus in assessing pretext must be on "the perception of the decisionmaker, that is, whether the employer believed its stated reason to be credible." *Mesnick*, 950 F.2d at 824 (internal quotation marks and citation omitted).   Whether a decision was wise or made precipitously is irrelevant so long as it was not made with discriminatory animus.   *See, e.g., Rivera-Aponte v. Rest. Metropol #3, Inc.*, 338 F.3d 9, 11-12 (1st Cir. 2003) (fact that plaintiff was never allowed to explain his side of the story was insufficient to show that discrimination was the true reason for his termination).   The evidence in the record fully supports ADT's good faith belief that Trent had engaged in unethical conduct, a belief that Trent has failed to rebut in any material fashion.   Consequently, judgment on the state and federal age discrimination claims will enter for ADT. [12, 13]

---

Ionelli engaged in unprofessional workplace conduct, whereas Trent was ultimately terminated for fraud and theft.   *See Conward v. Cambridge Sch. Comm.*, 171 F.3d 12, 20 (1st Cir. 1999) ("[C]omparison cases . . . must closely resemble one another in respect to relevant facts and circumstances . . . .")

[12] Trent also claims that he was discriminated against on the basis of his gender.   Because he has put forth no evidence whatsoever suggesting that he was discriminated against because he is male, this claim will be summarily dismissed.   *See LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 841 (1st Cir. 1993) ("To oppose [a summary judgment] motion successfully, the nonmoving party may not rest upon mere allegations or denials of his pleading" (internal citation and quotation marks omitted)).

**Retaliation**

Trent also alleges that ADT illegally retaliated against him for exercising his rights under the ADEA, Title VII, and Mass. Gen. Laws ch. 151B.   To make out a prima facie case of retaliation, Trent must demonstrate that: (1) he engaged in protected conduct; (2) he was subjected to an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse action.   *Noviello v. City of Boston*, 398 F.3d 76, 88 (1st Cir. 2005).   Once the prima facie case has been made, a retaliation claim is analyzed under the same burden-shifting framework as a discrimination claim, whereby "the defendant must articulate a legitimate, nondiscriminatory reason for its action" in order to shift the burden back to the plaintiff to show that the employer's justification was merely a pretext for retaliatory motivation. *Valentin-Almeyda v. Municipality of Aguadilla*, 447 F.3d 85, 95 (1st Cir. 2006) (internal quotation marks and citation omitted).

---

[13] Additionally, Trent's MCAD charge and Second Amended Complaint allege that he was discriminated against on the basis of national origin.   In this regard, Trent testified that coworkers Lippa and Ionelli are Jewish, and that Haigh might be "part Jewish."   He claims that Lippa and Ionelli complained to Haigh about how Jewish employees lost out on sales leads during the Jewish holidays and that he often heard them say that Jewish employees at ADT had to "stick together."   The court is at loss to understand how this "evidence" bears on Trent's discrimination claims against ADT. This claim will also be dismissed.

Assuming for present purposes that Trent has established a prima facie case of retaliation, and given ADT's articulation of a legitimate nondiscriminatory reason for terminating Trent, it falls to Trent to demonstrate that ADT's stated reason is pretextual.   Trent alleges that during the final few years of his employment, he complained to managers on several occasions about inappropriate behavior on the part of coworkers. He points to two emails to Haigh and Cournane in March and May of 2009, accusing Lippa of sending pornography to a coworker and Ionelli of lifting her shirt in the office.

The timing of these complaints, however, is suspect, as each was asserted immediately after Trent had been disciplined for unethical conduct.[14] Statutes barring retaliation do not "clothe the complainant with immunity for past and present inadequacies, unsatisfactory performance, and uncivil conduct . . . ."   *Mesnick*, 950 F.2d at 828-829 (internal quotation marks and citation omitted).   "Were the rule otherwise, then a disgruntled employee, no matter how poor his performance or how contemptuous his attitude toward his supervisors, could effectively inhibit a well-deserved

---

[14] Trent raised the allegations about Lippa a few days after receiving a final warning for leaving Lippa a threatening voicemail. His complaint regarding Ionelli was filed a few days after being suspended (but prior to being terminated) for the three fraudulently booked sales.

discharge by merely filing, or threatening to file, a discrimination complaint." *Id.* at 828.   Consistent with company policy, ADT disciplined Lippa and Ionelli for workplace misconduct a few months after Trent complained to Haigh and Cournane.[15]

Trent has not offered any additional facts that would indicate ADT's rationale for his discharge was a pretext for retaliation.[16]   Instead, his proffered evidence, as with his discrimination claims, "relates exclusively to whether the business decisions made by [ADT] in its efforts to deal with an employee it perceived [to be unethical] were, or were not, plausible." *See Mesnick*, 950 F.2d. at 828.   Although such evidence may be indicative of an unwise or hastily made decision, it does not, without more, create a trialworthy issue of retaliatory animus.   *See Rivera-Aponte*, 338 F.3d at 11.

---

[15] After investigating Trent's complaint regarding Lippa, ADT suspended Lippa for two weeks and issued him a final written warning. ADT was able to partially confirm Trent's accusations about Ionelli and issued her a warning.

[16] Trent notes that, at some unspecified point during his employment, coworker Marty Mansfield allegedly overheard Bouchard say that he wanted to "get rid of" Trent.   As ADT points out, and the record shows, there were a number of nondiscriminatory reasons Bouchard may have wanted to "get rid of" Trent.   Even so, the record reflects that Bouchard could not have made this statement any later than January of 2006, as that is when Mansfield's employment with ADT ended. The comment's probativeness is therefore "circumscribed [because it was] made in a situation temporally remote from the date of the employment decision . . . ." *See McMillan v. Massachusetts Soc. for Prevention of Cruelty To Animals*, 140 F.3d 288, 301 (1st Cir. 1998).

Judgment on Trent's state and federal retaliation claims will therefore enter for ADT.

**Hostile Work Environment**

A plaintiff may recover on a hostile work environment theory when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." [17] *Harris v. Forklift Sys.*, Inc., 510 U.S. 17, 21 (1993) (internal quotation marks and citation omitted).   In determining whether an environment is sufficiently "hostile" or "abusive," a court should examine all of the surrounding circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23.   "The thrust of this inquiry is to distinguish between the ordinary, if occasionally unpleasant, vicissitudes of the workplace and actual harassment."   *Noviello*, 398 F.3d at 92.

The facts that Trent relies on in support of his hostile work environment claim are these: that coworker Lippa texted pornography to

---

[17] The state and federal claims for hostile work environment are evaluated similarly.   *Walker v. City of Holyoke*, 523 F. Supp. 2d 86, 106 (D. Mass. 2007).

Ionelli's phone; that, on at least one occasion, Ionelli flashed her breasts at Trent and others; and that Ionelli often spoke at the office about her "sexual escapades."[18]   None of this amounts to a showing of a hostile environment, particularly given the fact that very little of the "hostility" Trent cites was directed at him.   Title VII is not a "general civility code" and as such only forbids conduct "so objectively offensive as to alter the 'conditions' of the victim's employment."   *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998).   Although the coarse incidents Trent cites may reflect a work environment that was at times unprofessional, no reasonable jury could find that they amount to the type of "severe" or "pervasive" harassment required by Title VII.   *See Faragher v. City of Boca Raton,* 524 U.S. 775, 787–788 (1998) (noting that "isolated incidents" will not create a hostile environment unless "extremely serious"); *O'Rourke v. City of Providence*, 235 F.3d 713, 729 (1st Cir. 2001) ("[O]ffhand comments, and isolated incidents are not sufficient to create actionable harassment" (internal quotation marks and citation omitted)).

---

[18] Trent also claims that coworker Al Herrera directed lewd comments and propositions toward him in 2004, 2005, and 2006.   The record reflects that Herrera left ADT's employment in 2003.   In any event, these allegations do not substantially relate to any of the conduct that Trent alleges occurred within the statute of limitations.   *Noviello*, 398 F.3d at 86.

**Claims for Unpaid Commissions**

Trent argues that he is owed unpaid commissions under both the Massachusetts Wage Act and theories of breach of contract and promissory estoppel.   Mass. Gen. Laws ch. 149, § 148.   A proper analysis of his claims requires a brief overview of ADT's compensation plan.

Under ADT's compensation plan,[19] a residential sales representative receives commission payments immediately upon booking a sale.   A sale is therefore not "earned" until the installation of a security system is completed. [20]   Advances on unearned commissions consist of three main components: annual recurring revenue (ANSC),[21] installation revenue, and unit production revenue.   If a customer cancels prior to installation, the sale

---

[19] Although ADT has submitted multiple versions of its yearly compensation plan, neither party disputes that the plan remained substantively the same throughout Trent's employment.

[20] According to the compensation plan, "Sales Reps understand and agree that commissions are paid in *advance*, but *are not earned* until the installation is completed . . . ." and that "there is a full 100% charge back of advance commission and sales production credit for contracts never installed or installed but never effective." Bouchard Aff. ¶¶ 46-49, Exs. 20, 21, 22, and 23. (emphases in original).

[21] The plan refers to ANSC as "recurring *annual* revenue," "*annual* recurring revenue," and "*annual* service charge" and states that sales representatives are compensated for "ANSC times-one." Bouchard Aff. ¶¶ 51-52. (emphases added).

is subject to 100% charge back, and the representative retroactively loses the commission.   A sales representative who believes that ADT has made a mistake in calculating his or her advances can, with the approval of a manager, submit a "manual commission adjustment" (MCA) form indicating what he or she thinks is owed.   The ADT compensation group then reviews the MCA form and, if a mistake is identified, ADT pays the representative the appropriate amount.   If, however, the compensation group determines that the representative has been appropriately paid, no adjustment on the commission payments is made.

To support his claims for unpaid commissions, Trent points to two "unfair" compensation policies employed by ADT: advanced commission charge-backs and annual service charge revenue.   According to Trent, sales representatives are wrongfully penalized when an installation is cancelled because ADT both charges back for the advanced commission received and deducts from the representative's monthly "unit production" number.[22]   In a similar vein, Trent alleges that sales representatives should be paid commission based on three years of a contract's recurring revenue instead of one.

---

[22] Trent refers to this practice as "double jeopardy."

Manifestly, these are not complaints about unpaid commissions under ADT's plan, but complaints about the extra commissions Trent believes that he would have received had ADT implemented a different plan more to his liking.   ADT's plan was in place when Trent joined the company and was an explicit term of his employment.   The plan remained essentially unchanged throughout Trent's tenure.   Moreover, the fact that some of Trent's managers may have at times agreed that the policies were unfair is irrelevant.   The record does not reflect any evidence to suggest that these managers *promised* to pay Trent for these alleged inequities, or that he reasonably relied on the managers' statements as such.

Trent further argues that he was not paid properly on a number of the MCA forms he submitted over the years.   ADT has offered a detailed analysis of Trent's MCA forms and identified a number of reasons Trent was not paid additional monies.[23]   Trent, however, has produced only a series

---

[23] ADT asserts that some of Trent's commission requests were denied because: (1) Trent received the payment before he submitted MCA forms; (2) jobs were cancelled by customers; (3) Trent incorrectly requested SGL bonuses; (4) Trent incorrectly claimed to be owed a higher unit production bonus than he qualified for; (5) Trent requested SGL payments for jobs that were actually resales and therefore not eligible for a commission payment; and (7) Trent requested payment for unit production pay that he claimed he "lost" when a sale was cancelled and then rebooked at a later date.

of handwritten notes listing what he claims he is owed.[24]   When asked how he arrived at the figures, Trent asserted that they are estimates, and that he just "averaged" them out.   This evidence is grossly insufficient to show that his commissions have been "definitely determined" and are "due and payable" as required by the Massachusetts Wage Act.   Mass. Gen. Laws ch. 149, § 148; *see Okerman v. VA Software Corp.*, 69 Mass. App. Ct. 771, 780 (2007) (commissions must be "arithmetically determinable").

Finally, Trent's argument that his managers promised him the commissions by signing off on his MCA forms and sending them to be processed is unpersuasive.   ADT's MCA form submission policy requires that the ADT compensation group ultimately make the decision about whether a sales representative has been appropriately paid.   That Trent's managers signed off on the MCA forms so that Trent could submit them to the compensation group indicated only that his claims would be reviewed, not that they would be paid.   As Trent has produced no competent evidence suggesting that ADT failed to pay him earned commissions, his claims under

---

[24] The notes summarize the total amount of commissions Trent claims he is owed going back to 2001.   At oral argument, Trent acknowledged that the relevant statutes of limitation bar claims for the majority of these commissions.

the Massachusetts Wage Act, breach of contract and promissory estoppel are dismissed.

## ORDER

For the foregoing reasons, ADT's motion for summary judgment is ALLOWED.   The Clerk will enter judgment for ADT and close the case.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE